No. 18-4137

═══════════════════

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

─────────────

BLOCK COMMUNICATIONS, INC.; LIMA COMMUNICATIONS
CORPORATION; WEST CENTRAL OHIO BROADCASTING
CORPORATION,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

─────────────

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

─────────────

## BRIEF FOR RESPONDENTS

─────────────

MAKAN DELRAHIM
ASSISTANT ATTORNEY GENERAL

MICHAEL F. MURRAY
DEPUTY ASSISTANT ATTORNEY GENERAL

ROBERT B. NICHOLSON
PATRICK M. KUHLMANN
ATTORNEYS

UNITED STATES
    DEPARTMENT OF JUSTICE
WASHINGTON, D.C. 20530

THOMAS M. JOHNSON, JR.
GENERAL COUNSEL

DAVID M. GOSSETT
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

PAMELA L. SMITH
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C. 20554
(202) 418-1740

# TABLE OF CONTENTS

Table of Authorities.........................................................................iii

Introduction .......................................................................................1

Jurisdiction .......................................................................................2

Question Presented ...........................................................................2

Statutes and Regulations ..................................................................2

Counterstatement...............................................................................3

I.   Statutory and Regulatory Background........................................3

II.  Factual Background ...................................................................5

    A.   The Petition To Modify WHIO's Television Market. .........5

    B.   The Bureau Order. ..............................................................7

    C.   The *Order on Review*. .......................................................9

        1.   The Statutory Factors. ...................................................10

        2.   Block's Economic Expectations. ...................................15

Summary of Argument.....................................................................16

Standard of Review ..........................................................................18

Argument..........................................................................................19

I.   Block Lacks Standing To Challenge the *Order on Review* ....19

II.  The Commission Reasonably Exercised Its Discretion in Granting Cox's Market Modification Request. .......................21

    A.   Block's Economic Expectations Deserved Little Weight..................23

    B.   The Commission Did Not Misapply the In-State Service Factor...................................................................26

C.  The Commission Properly Applied the Remaining
    Factors. ...................................................................................29

D.  Congress Did Not Mandate a Comparative Analysis in
    Section 614. ..............................................................................32

Conclusion....................................................................................33

# TABLE OF AUTHORITIES

**CASES**

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992)....................................18

*Cablevision Sys. Corp. v. FCC*, 570 F.3d 83 (2d Cir. 2009)....................................................... 22, 23, 31

*Cellnet Communications, Inc. v. FCC*, 149 F.3d 429 (6th Cir. 1998) ...................................................28

*Kentucky Coal Ass'n v. Tennessee Valley Auth.*, 804 F.3d 799 (6th Cir. 2015)....................................18

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)............................... 19, 21

*Lyshe v. Levy*, 854 F.3d 855 (6th Cir. 2017) ................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 (1983)..................................... 18, 23

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) .............................19

*Tennessee Republican Party v. SEC,* 863 F.3d 507 (6th Cir. 2017) ................................................... 19, 21

*Time Warner Entm't Co. v. FCC*, 56 F.3d 151 (D.C. Cir. 1995).......................................................22

*Turner Broadcasting Sys. v. FCC*, 520 U.S. 180 (1997) ..................................................................3

**ADMINISTRATIVE DECISIONS**

*In Re: News Press & Gazette Wilmington, North Carolina*, 10 FCC Rcd 10331 (1995).......................11

*In the Matter of Amendment to the Commission's Rules Concerning Market Modification*, 30 FCC Rcd 10406 (2015) ......................................... 27, 28, 33

*In the Matter of Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 8 FCC Rcd 2965 (1993)................................... 5, 30

*In the Matter of Monongalia County, West Virginia and Preston County, West Virginia*, 33 FCC Rcd 1168 (MB 2018) ..............................................3

*WTNH Broadcasting, Inc.*, 22 FCC Rcd 19761 (MB
    2007) ................................................................................. 9, 33

**STATUTES**

5 U.S.C. §706(2)(A) ..............................................................18

28 U.S.C. §2342(1) .................................................................2

28 U.S.C. §2344 .....................................................................2

47 U.S.C. §402(a) ...................................................................2

47 U.S.C. §405(a) .................................................................28

47 U.S.C. §534 .......................................................................1

47 U.S.C. §534(a) ...................................................................3

47 U.S.C. §534(h)(1)(A) ......................................................3, 7

47 U.S.C. §534(h)(1)(C) .................................................4, 17, 22

47 U.S.C. §534(h)(1)(C)(i) .....................................................3

47 U.S.C. §534(h)(1)(C)(ii) ...................................................32

47 U.S.C. §534(h)(1)(C)(ii)(I) ...............................................10

47 U.S.C. §534(h)(1)(C)(ii)(II) .........................................11, 30

47 U.S.C. §534(h)(1)(C)(ii)(III) .............................................13

47 U.S.C. §534(h)(1)(C)(ii)(IV) .............................................14

47 U.S.C. §534(h)(1)(C)(ii)(V) ..............................................14

47 U.S.C. §534(h)(1)(C)(ii)(I)-(V) ...........................................5

STELA Reauthorization Act of 2014, Pub. L. No.
    113-200, 128 Stat. 2059 (2014) .........................................5

**RULES**

47 C.F.R. §76.55(d) ................................................................7

47 C.F.R. §76.55(e)(2) ............................................................3

47 C.F.R. §76.59 ...................................................................17

**INTRODUCTION**

Pursuant to Section 614 of the Communications Act of 1934, 47 U.S.C. §534, television stations in a local market may demand to be carried by local cable and other multichannel video programming distributors (MVPDs). Cox Media Group (Cox), licensee of the CBS-affiliated station WHIO-TV in Dayton, Ohio, petitioned the Federal Communications Commission to modify WHIO's local cable television market to include nearly two dozen communities located in Auglaize County, Ohio (Auglaize County Communities), which WHIO had served for many years.

Block Communications, Inc., Lima Communications Corporation, and West Central Ohio Broadcasting Corporation (collectively, Block), licensee of two stations located in nearby Lima, Ohio, that carry affiliates of all four major networks on different digital channels, opposed the grant of Cox's market modification petition.

The FCC granted the petition to modify WHIO's market to include the Auglaize County Communities. Affirming the decision of the agency's Media Bureau, the Commission concluded that the statutory factors set forth in Section 614, considered individually and collectively, supported Cox's request.

Block now seeks judicial review, but as we show, it lacks Article III standing because it has failed to demonstrate that it has been injured by the

Commission's decision. And even if Block could demonstrate standing, it has failed to show that the agency acted unreasonably in modifying WHIO's television market.

## JURISDICTION

The Commission released the order under review—*In the Matter of Petition for Modification of Dayton, OH Designated Market Area with Regard to Television Station WHIO-TV, Dayton, OH*, FCC 18-130 (*Order on Review*) (PA-0828)—on September 19, 2018. Block timely filed a petition for review on November 16, 2018, *see* 28 U.S.C. §2344, seeking to invoke the Court's jurisdiction under 47 U.S.C. §402(a) and 28 U.S.C. §2342(1). But as noted above and discussed below, Block has not shown that it has suffered an injury in fact, and so Block lacks standing to challenge the agency's action.

## QUESTION PRESENTED

1. Whether Block has standing to challenge the *Order on Review*.

2. Assuming Block has standing, whether it has demonstrated that the Commission's decision to grant Cox's market modification petition was arbitrary and capricious.

## STATUTES AND REGULATIONS

The pertinent statutory provisions and regulations are set forth in the appendix to this brief.

## COUNTERSTATEMENT

## I.    Statutory and Regulatory Background

Section 614 of the Communications Act requires cable television operators to carry the broadcast signals of "local commercial television stations." 47 U.S.C. §534(a); *see Turner Broadcasting Sys. v. FCC*, 520 U.S. 180, 224 (1997) (upholding the constitutionality of such "must-carry" rights). The statute defines a "local commercial television station" as a full power commercial television station that is "within the same television market as the cable system." 47 U.S.C. §534(h)(1)(A). A local television station's market ordinarily "shall be determined by the Commission by regulation or order using, where available, commercial publications which delineate television markets based on viewing patterns." 47 U.S.C. §534(h)(1)(C)(i). The Commission's rules currently specify that a commercial broadcast television station's market by default is the station's "Designated Market Area," or "DMA," as determined by Nielsen Media Research (Nielsen). 47 C.F.R. §76.55(e)(2).[1]

---

[1] As relevant here, a DMA is a geographic market designation that is delineated based on viewing patterns; on a yearly basis, Nielsen assigns each county in the United States (except for certain counties in Alaska) exclusively to a DMA based on the county's viewing patterns. *See In the Matter of Monongalia County, West Virginia and Preston County, West Virginia*, 33 FCC Rcd 1168, 1169 ¶3 & n.8 (MB 2018).

Although Congress mandated that the FCC rely on commercial publications to delineate viewing markets in the ordinary course, it recognized that such publications may not accurately reflect the markets of all television stations. Accordingly, Section 614 provides a process for the Commission to modify the local market associated with a specific broadcast television station. The statute authorizes the Commission, "following a written request," and "with respect to a particular television broadcast station," to "include additional communities within its television market or exclude communities from such station's television market to better effectuate the purposes of this section." 47 U.S.C. §534(h)(1)(C).

When considering such a market-modification request, the statute directs the Commission to "afford particular attention to the value of localism by taking into account such factors as" the five that are specifically set forth in the statute:

(1) whether the station has been "historically carried" on the cable system(s) in the community;

(2) whether the station provides "coverage or other local service" to that community;

(3) whether the requested modification "would promote consumers' access to television broadcast signals that originate in their State of residence";

(4) whether any other television station eligible to be carried by the cable system(s) in the community "provides news coverage of issues of concern to such community" or carries or covers "sporting and other events of interest to the community"; and

(5) "evidence of viewing patterns" in cable and noncable household in that community.

47 U.S.C. §534(h)(1)(C)(ii)(I)-(V).[2] In this way, as the Commission has explained, Section 614 "is intended to permit the modification of a station's market to reflect its individual situation." *See In the Matter of Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 8 FCC Rcd 2965, 2977 ¶47 (1993) (*Must-Carry Order*).

## II.    Factual Background

### A.    The Petition To Modify WHIO's Television Market.

Auglaize County, Ohio, sits between Dayton, Ohio (in Montgomery County) and Lima, Ohio (in Allen County). Over the years, Nielsen has repeatedly assigned Auglaize County to either the Dayton DMA or the Lima DMA. Petition for Special Relief (Pet.) at 4-5 (PA-0012–PA-0013).

On July 26, 2013, Cox petitioned the FCC to modify the television market of WHIO, its CBS-affiliated station located in Dayton, Ohio, to include the Auglaize County Communities regardless of whether Auglaize County was assigned to the Dayton DMA by Nielsen. Pet. at 4 (PA-0012). Cox explained that the Auglaize County Communities were at that point (the 2012-2013 television year) assigned to the Dayton DMA by Nielsen, as they had been for the two prior years. *See* Pet. at

---

[2] The third statutory factor was added in 2014—after the filing of the market-modification request at issue here—by the STELA Reauthorization Act of 2014 (STELAR), Pub. L. No. 113-200, §102(b), 128 Stat. 2059, 2061 (2014).

20 (PA-0028). But, Cox explained, Nielsen had advised it that—because of county-wide viewing patterns—"Auglaize County will be assigned to the Lima DMA for the 2013-2014 Television Year." *Ibid.* (PA-0028). Cox noted that it was poised to lose must-carry rights in the Auglaize County Communities even though WHIO was the most-watched station in Auglaize County. *Id.* at 27 (PA-0035); *see* Pet. Exh. P (PA-0321). To "eliminate any future confusion over whether the Auglaize County Communities are part of WHIO-TV's market," *id.* at 20 (PA-0028), Cox petitioned the agency to find that these communities are "a permanent part of WHIO-TV's market," *id.* at 21 (PA-0029).[3]

Block, the licensee of two television stations in Lima, Ohio—WLIO, a full-power station that broadcasts NBC and FOX programming on two digital channels, and WOHL-CD, a low power station that broadcasts CBS and ABC programming on two digital channels—opposed the modification petition. Opposition to Petition for Special Relief (PA-0382) (Block Opp.). Block argued that WHIO had failed to satisfy the statutory factors for market modification because, although Cox's

---

[3] In addition to the 23 communities located in Auglaize County, Cox petitioned the Bureau to include in WHIO's market ten communities in Wayne County, Indiana, and nine communities in Allen County, Ohio. *See* PA-0002–PA-0004. The Bureau granted Cox's petition with respect to the Wayne County communities but denied inclusion of the Allen County communities. PA-0741, PA-0746. No party sought further review of the Bureau's action with respect to these portions of Cox's petition, and they are not at issue here.

station has historically been carried in the Auglaize County Communities, Block's Lima stations "[also] have [been] historically carried" in those communities, *id.* at 10 (PA-0393), "provide a stronger signal" than Cox's station, *id.* at 11 (PA-0394), and "are significantly closer to each community than WHIO-TV," *id.* at 12 (PA-0395); and WHIO's "favorable ratings" in Auglaize County "do not . . . demonstrate that the requested area is a part of WHIO-TV's natural economic market." *Id.* at 22 (PA-0405). Block also argued that, because its "Lima CBS affiliate cannot exercise must carry rights" even within the Lima DMA,[4] a grant of the WHIO modification petition "would deeply undercut B[lock]'s economic expectations," *id.* at 26 (PA-0409), and would give WHIO "a competitive and unnecessary advantage" over Block's Lima stations, *id.* at 27 (PA-0410).

## B.  The Bureau Order.

On November 25, 2013, the Commission's Media Bureau granted Cox's petition to include the Auglaize County Communities within WHIO's television market, finding that WHIO "meets the statutory market modification factors." *In the Matter of Petition for Modification of Dayton, OH Designated Market Area*

---

[4] Only a narrow category of qualified low power television stations has must-carry rights under 47 U.S.C. §534(h)(1)(A). *See* 47 C.F.R. §76.55(d). WOHL-CD is not such a station.

*with Regard to Television Station WHIO-TV, Dayton, OH*, 28 FCC Rcd 16011, 16021 ¶27 (MB 2013) (*Bureau Order*) (PA-0735).[5]

The Bureau found that the station had a "history of carriage"—Factor I—based on evidence that WHIO had been carried on cable systems in some Auglaize County Communities as early as 1972, and was currently being carried in all of the Auglaize County Communities. *Bureau Order* at ¶¶18, 27 (PA-0742, PA-0745). Turning to Factor II, the Bureau found that WHIO provides coverage and other local service to the Auglaize County Communities: All of those communities were predicted to receive a Grade B signal from the station,[6] and over a two-year period WHIO had aired 65 news segments—as well as weather, high school sports, and other local interest coverage—concerning Auglaize County. *See ibid.* (PA-0745). In addition, the Bureau found that WHIO garners substantial viewership in the Auglaize County Communities, *ibid* (PA-0745)—Factor V—and in fact the record

---

[5] The Bureau's order predated the addition of the third statutory factor (*see* n.2, *supra*), but for clarity we will refer to the factors as renumbered in 2014.

[6] Grade B is a measure of analog broadcast signal strength. As the Bureau noted, the equivalent of Grade B signal coverage for digital signals is a station's "noise limited service contour." *Bureau Order* at n.15 (PA-0737).

reflected that in the two years preceding the filing of the modification petition, WHIO was the most-watched station in Auglaize County.[7]

Thus, "[g]iven the station's history of carriage, its provision of local programming, and the meaningful viewership shares garnered by WHIO in these communities," the Bureau granted the petition and added "the Auglaize County communities to WHIO's television market for mandatory carriage purposes." *Id.* at ¶27 (PA-0745 - PA-0746).

### C.  The *Order on Review*.

Block sought Commission review of the *Bureau Order*. Application for Review (PA-0748). In its application, Block argued that the Bureau (1) had not given "due weight" to the fact that Block's stations had historically been carried by cable companies in the Auglaize County Communities; (2) failed to consider Block's "stronger evidence concerning signal coverage, proximity and other local service"; (3) had erred in finding that viewership patterns supported WHIO's petition despite evidence that Block's stations also "garnered significant

---

[7] The Bureau held that Factor IV—whether other stations provide news or sports coverage of interest to the community—"neither weigh[ed] against nor in favor of WHIO's modification request." *Id.* at ¶22 (PA-0743–PA-0744) The Bureau relied on Commission precedent that this factor is designed "to enhance a station's market modification where it could be shown that other stations did not serve the communities at issue"—but not to undermine the claim where other stations do in fact serve the communities. *Id.* at n.74 (citing *WTNH Broadcasting, Inc.*, 22 FCC Rcd 19761, 19768 ¶13 (MB 2007)).

viewership"; and (4) had erred "by failing to protect the economic expectations underlying B[lock]'s affiliation with CBS." *Id.* at 3 (PA-0755).

The Commission denied Block's application and affirmed the Bureau's order. *Order on Review* (PA-0828). In doing so, the Commission assessed Cox's modification petition based on the standard set forth in Section 614 and the five statutory factors specifically set forth there, as well as in light of Block's argument that the grant of Cox's market-modification request would upset Block's economic expectations.

### 1. The Statutory Factors.

a. <u>Historical Carriage</u>. The Commission first found that the historical carriage factor, *see* 47 U.S.C. §534(h)(1)(C)(ii)(I), weighed in favor of modification, *Order on Review* at ¶¶8-10 (PA-0831–PA-0832). The Commission explained that WHIO had been carried on cable systems in portions of Auglaize County as early as 1972, and by 2012 was carried in all of the Auglaize County Communities. *Id.* at ¶10 (PA-0832).

Block challenged this determination because its CBS station, too, "has historically been carried by the cable systems in Auglaize County." *Id.* at ¶8 (PA-0831). The Commission rejected this argument: The fact that Block's station had been carried in the Auglaize County Communities, the Commission held, did not "mitigate the significance of WHIO's prior carriage"; the "historic relationship

between a station and a community of subscribers is not undermined simply because another station has also been historically carried within that particular community." *Id.* at ¶9 (PA-0831). In any event, the Commission held, the historical carriage factor would still have weighed in favor of including the Auglaize County Communities in WHIO's market even had the Bureau engaged in a "comparative analysis" of the stations, because "the Auglaize County communities have been associated with the Dayton market … for a considerable period of time." *Id* at ¶10 (PA-0832) (quoting *In Re: News Press & Gazette Wilmington, North Carolina*, 10 FCC Rcd 10331, 10333 ¶12 (MB 1995)) (internal quotation marks and edits omitted). As the Commission noted, "Nielsen had assigned Auglaize County to the Dayton DMA for 38 out of the 46 years prior to the [*Bureau*] *Order*," and WHIO in particular had been carried by cable systems in various Auglaize County Communities as early as 1972. *Ibid.* (PA-0832).

b. Coverage and Local Service. The Commission next considered whether the television station "provides coverage or other local service" to the community. *See* 47 U.S.C. §534(h)(1)(C)(ii)(II). In doing so, the Commission explained that "the relevant inquiry here is not whether WHIO provides *greater* coverage than B[lock]'s Lima stations," but whether WHIO "provides locally-focused programming that is of significant interest to the residents in the communities." *Id.*

at ¶11 (PA-0832). The Commission agreed with the Bureau that WHIO did. *Ibid.* (PA-0832).

The Commission explained that the evidence showing that "all Auglaize County communities receive Grade B coverage from WHIO … is sufficient to establish that WHIO can and does reach all the communities it seeks to add." *Id.* at ¶12 (PA-0832–PA-0833). The Commission also found that the fact that WHIO "aired 65 news segments and 210 weather advisories that directly affected Auglaize County" in a two-year period sufficiently "indicates that WHIO provides local programming for [the] Auglaize County communities." *Id.* at ¶13 (PA-0833). The Commission again rejected Block's attempt to make application of this factor into a comparative question, holding that Block's evidence regarding "the frequency and quality of *its own* local programming [] was not relevant." *Ibid.* (emphasis added) (PA-0833).

c. <u>In-State Service</u>. The Commission also considered whether granting Cox's market-modification request would "promote consumers' access to television broadcast station signals that originate in their State of residence." *Id.* at

¶¶14-15 (PA-0833 - PA-0834). *See* 47 U.S.C. §534(h)(1)(C)(ii)(III).[8] As the Commission explained, it had previously determined that this factor could be satisfied "simply by showing that the involved station is licensed to a community within the same state as the new community," but that the factor would carry more weight if the "station provides programming specifically related to the subscribers' state of residence," and the most weight if the subscribers "have little (or no) access to such in-state programming." *id.* at ¶15 & n.46 (PA-0834). Here, because WHIO is licensed to a community in the same state as the Auglaize County Communities, and "provides programming specifically related to Ohio," the Commission found the factor weighed in favor of Cox's modification request, *ibid.* (PA-0834)—but not "additional positive weight" because there was no evidence that Auglaize residents would lack access to in-state programming absent WHIO, *id.* at n.47 (PA-0834).

---

[8] The Commission acknowledged that this factor was added to Section 614 after the *Bureau Order* was rendered, and thus that the Bureau had no opportunity to consider it. *Id.* ¶14 (PA-0833). But, the Commission found, consideration of this later-enacted factor was not impermissibly retroactive because it "is simply an additional piece of information the Commission must consider in its evaluation of whether modifying a market will fulfill Congress's [existing] objective to promote consumer access to local programming." *Ibid.* (PA-0834). In any event, the Commission noted, "evaluation of the remaining factors supports the Bureau's decision to add [the] Auglaize County communities to WHIO's market" even were the Commission to disregard this factor entirely. *Id.* at n.63 (PA-0836).

d.  Other Station's Programming. The Commission also considered whether any other television station in the community provided coverage of news or sports or other events of interest to the community. *See* 47 U.S.C. §534(h)(1)(C)(ii)(IV). The Commission explained that "if a community's local needs are unserved by other stations, the absence will weigh in favor of adding the community to the petitioning station's market," but if "other stations do serve the community's local needs, then this factor is to be given neutral weight." *Order on Review* at ¶16 (PA-0834). Because Block "submitted ample evidence that it provides locally-focused news coverage and coverage of other events in the Auglaize County communities," the Commission found that the Bureau correctly gave this factor "neutral weight." *Ibid*. (PA-0835).

e.  Viewing Patterns. Finally, the Commission considered evidence of television "viewing patterns" in the Auglaize County Communities, as required by 47 U.S.C. §534(h)(1)(C)(ii)(V). The Commission noted that "WHIO's programs are popular in the Auglaize County communities," and, indeed, that in 2012 "WHIO was the highest-rated television station in Auglaize County." *Order on Review* at ¶17 (PA-0835). The Commission also stressed "evidence of strong and longstanding ties between WHIO and local advertisers in Auglaize County." *Ibid*. (PA-0835). Accordingly, as the Commission found, the Bureau correctly weighed

this factor in favor of adding the Auglaize County Communities to WHIO's market. *Ibid*. (PA-0835).

## 2. Block's Economic Expectations.

In addition to challenging the Bureau's application of the statutory factors, Block also argued that, irrespective of those factors, assigning the Auglaize County Communities to WHIO's local television market "would upset [Block's] economic expectations." *Id.* at ¶18 (PA-0835). According to Block, it would be "in a stronger position to sell advertising and compete for carriage" in the Auglaize County Communities assigned to the Lima DMA "in the absence of another CBS affiliate" that could assert must-carry rights. *Id.* at ¶18 (PA-0835).

The Commission disagreed. It was "not convinced" that Block "had legitimate economic expectations" under the circumstances, given that "Auglaize County had only been assigned to the Lima DMA in 8 out of the 46 years prior to WHIO's petition" and that "2013 was the first time in three years that Auglaize County had been assigned to the Lima DMA." *Id.* at ¶18 (PA-0835). It was therefore "skeptical that adding these [Auglaize County] communities to WHIO's market" would "upset any genuine expectations on B[lock]'s part," and thus did not take issue with the Bureau's decision to afford Block's economic expectations argument "little weight." *Id.* at ¶18 (PA-0836).

Having examined the statutory and non-statutory factors in view of the record, the Commission concluded that the "Bureau appropriately evaluated all relevant factors in its analysis of whether to add the Auglaize County communities to WHIO's market," and affirmed as "proper" the Bureau's grant of Cox's market-modification request. *Id.* at ¶19 (PA-0836). This petition for review followed.

## SUMMARY OF ARGUMENT

I.    Block cannot demonstrate that it has standing to invoke the Court's jurisdiction to challenge the *Order on Review*. In its opening brief, Block asserts only that the Commission unreasonably exercised its discretion in modifying WHIO's television market and thereby upset Block's expectations with respect to its own television stations. But to demonstrate standing, Block must show that it has suffered an injury in fact—an invasion of a legal protected interest that is concrete and particularized, and actual or imminent—due to the challenged agency action (and that such injury could be redressed by a favorable decision from the Court). Block's assertion that modification of WHIO's television market might negatively affect Block's ability to negotiate cable carriage of its own CBS affiliated station in the Auglaize County Communities is sheer speculation. Block's CBS station does not have, and never has had, must-carry rights in these communities. WHIO was the most-watched station in Auglaize County and was already carried by cable systems in these communities; and over the years,

WHIO—unlike Block's station—frequently has had must-carry rights there. Block thus has not met its burden of demonstrating standing, and so the Court should dismiss the petition for review for lack of jurisdiction.

II.     Even if Block had standing, its petition for review would fail on the merits. While the default rule under Section 614 of the Communications Act is that a station's television market will be determined by the DMA in which it is located, Congress specifically gave the FCC the right to modify any given station's television market to more accurately mirror its specific circumstances. *See* 47 U.S.C. §534(h)(1)(C); 47 C.F.R. §76.59. The Commission reasonably did just that, paying appropriate attention to the factors Congress delineated. At the time Cox petitioned the FCC to modify WHIO's television market to include the Auglaize County Communities, Auglaize County itself was assigned to the Dayton DMA— WHIO's default television market. And examining each of the statutory factors— as well as non-statutory factors raised by Block in opposing the petition—the agency concluded, based on substantial evidence in the record, that the Auglaize County Communities were part of WHIO's television market regardless of whether Auglaize County itself was assigned to the Dayton DMA or Lima DMA. The agency acted well within its discretion, and the petition for review should be denied.

## STANDARD OF REVIEW

The question whether Block has Article III standing is reviewed *de novo*. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).

On the merits, the Court may only set aside the *Order on Review* upon determining that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Under this narrow and deferential standard of review, the Court "should accept the agency's factual findings if those findings are supported by substantial evidence on the record as a whole." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).

The Court does not substitute its judgment for that of the agency, engage in "judicial second-guessing," or ask "whether the agency's decision was right." *Kentucky Coal Ass'n v. Tennessee Valley Auth.*, 804 F.3d 799, 801 (6th Cir. 2015). Instead, "[i]t asks whether there are good reasons" for the agency's action. *Id.* at 806 (internal quotation marks and citations omitted). As long as the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action,'" the Court "will not set aside its decision." *Id.* at 801 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

## I.   Block Lacks Standing To Challenge the *Order on Review*

"[O]n review of a final agency action," the Court requires a petitioner to "present specific facts supporting standing through citations to the administrative record or affidavits or other evidence attached to its opening brief, unless standing is self-evident." *Tennessee Republican Party v. SEC,* 863 F.3d 507, 517 (6th Cir. 2017) (internal quotation marks and citations omitted). Here, Block's standing is not self-evident and nothing in Block's opening brief demonstrates that it has standing to challenge the *Order on Review*.

The "irreducible constitutional minimum of standing" requires Block to demonstrate (1) an injury in fact that (2) is fairly traceable to the challenged agency action and (3) would be redressed by a favorable decision from the Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Here, Block has failed to meet the first element—injury in fact—because Block has not shown that it "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Tennessee*, 863 F.3d at 517 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (further citation omitted)).

Block asserts that, by granting Cox's market-modification petition, the Commission allowed WHIO "to assert must carry rights as to the Auglaize

Communities," which, Block contends, "will have a negative impact on Block's ability to negotiate with cable carriers in the Lima DMA." Block Br. at 37. Indeed, Block contends, the grant of Cox's market-modification request "creates the specter that [cable] systems . . . would drop the in-market Block Lima CBS station HD signal, and possibly the Block Lima CBS station altogether." *Id.* at 36.

Block's contentions are speculative. Block acknowledges that the programming stream of its CBS affiliate, WOHL-CD, does not have and has never had any must carry rights. *Id.* at 35. *See Bureau Order* at ¶26 (PA-0745) (noting that Block's CBS affiliate is aired on the secondary channel of a low-power station).  Block was thus always at risk, even before the grant of Cox's petition, that cable carriers might drop WOHL-CD's CBS programming, for whatever reason.

Moreover, even before the grant of Cox's petition, WHIO had must-carry rights in each of the years in which the Auglaize County Communities were assigned by Nielsen to the Dayton DMA. And as the highest-rated station in Auglaize County, WHIO was almost certain to be carried even without must-carry rights, as Block itself has conceded. *See* Block Opp. at 5 (PA-0388) (noting that WHIO's ratings "likely ensure continued voluntary carriage" on Auglaize County cable systems).

The record further shows that cable systems in Auglaize County have continued to carry Block's programming since the change in WHIO's market definition. *See* Block Opp. Exh. C (PA-0439). Indeed, as Block informed the Commission, "local cable systems have historically carried multiple CBS affiliates, including some systems that have carried three CBS affiliates for over 40 years—with many systems currently carrying WHIO-TV (Dayton) [Cox's station], WOHL-CD 35.2 (Lima) [Block's station], and WBNS (Columbus)." Block Opp. at 5-6 (PA-0388–PA-0389).

Block's assertion that the *Order on Review* injures its competitive position is therefore belied by the record.  Block is in no worse position now that WHIO's market has been modified than before. Because none of Block's purported injuries is "concrete and particularized" or "actual or imminent," but are instead only "conjectural" or "hypothetical," *see Lujan*, 504 U.S. at 559, the Court should dismiss its petition for review for lack of jurisdiction. *See Tennessee*, 863 F.3d at 521.

## II.     The Commission Reasonably Exercised Its Discretion in Granting Cox's Market Modification Request.

Even if Block had standing to assert its challenge to the Commission's order, its claims would fail on the merits. The Commission had broad discretion to

modify WHIO's market to include the Auglaize County Communities. Its decision to do so was reasonably explained and firmly grounded on the record.

Section 614 of the Communications Act authorizes the Commission to modify a commercial television station's market to include or exclude specific communities, affording "particular attention to the value of localism by taking into account such factors as" the five that are identified in the statute – among them historical carriage, coverage to the community, and viewing patterns. 47 U.S.C. §534(h)(1)(C). While the statute directs the Commission to consider those factors —and permits it to consider others—it does not require the Commission to give any individual factor particular emphasis. *See Cablevision Sys. Corp. v. FCC*, 570 F.3d 83, 94 (2d Cir. 2009) (a statute that "by its terms merely requires the Commission to consider the . . . factors . . . means only that it must reach an express and considered conclusion about the bearing of a factor, but is not required to give any specific weight to it") (quoting *Time Warner Entm't Co. v. FCC*, 56 F.3d 151, 175 (D.C. Cir. 1995)).

Here, the Commission considered each of the five statutory factors and, in view of substantial evidence in the record, reasonably determined that four of those factors weighed in favor of modifying WHIO's market and the other was neutral. *See Order on Review* at ¶19 & n.63 (PA-0836). The Commission also considered Block's argument that market modification would interfere with its economic

expectations, but the agency "was not convinced" that any such expectations were legitimate, and therefore saw no reason to give the argument anything other than "little weight" in assessing whether to modify WHIO's market. *Id.* at ¶18 (PA-0836). Accordingly, the Commission found that the "grant of WHIO's market modification request was proper." *Id.* at ¶19 (PA-0836).

Block now urges the Court to set aside the *Order on Review*, not because the agency failed to articulate a "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs.*, 463 U.S. at 43, but to have the agency "reconsider the evidence . . . and assign appropriate weight to the statutory and non-statutory factors associated with Cox's Petition," Block Br. at 25. But it is not for this Court to reweigh factors that the Commission has already considered, *see Cablevision*, 570 F.3d at 94, or to "substitute its judgment for that of the agency," *Motor Vehicle Mfrs.*, 463 U.S. at 43. Where, as here, the Commission has considered the relevant factors, weighed the record evidence, and determined that the record as a whole supported modification of WHIO's market, there is no basis for the Court to disturb the Commission's determination.

## A. Block's Economic Expectations Deserved Little Weight.

Block chiefly complains that the Commission "ignored the evidence Block provided that its economic expectations would be undermined by grant of Cox's Petition." Block Br. at 34. Block asserted that it had paid consideration "for the

right to be the CBS affiliate in the Lima DMA—including the Auglaize Communities" and "to receive the economic benefits of that affiliation, including the right to sell local advertising time" on that programming. *Id*. at 34-35. In Block's view, it had a "reasonable expectation . . . that, as the in-market CBS affiliate within the Lima DMA, it would be in a position to negotiate carriage on generally equal terms with out-of-market stations." *Id*. at 35. That expectation, Block argues, would be undermined by modifying WHIO's market to include the Auglaize County Communities, since it would entitle WHIO to demand carriage by cable systems in the Auglaize County Communities, while Block's station, WOHL-CD, is a low-power station that is not entitled to such rights. *Ibid*.

Even if Block's claims of injury were sufficient to support Article III standing, *but see Section I*, *supra*, the Commission considered and reasonably rejected Block's argument on the merits. *Order on Review* at ¶18 (PA-0835). The Commission was unpersuaded that Block had any "legitimate economic expectations" regarding its competitive position in the Auglaize County Communities "given that Auglaize County had only been assigned to the Lima DMA in 8 out of the 46 years prior to WHIO's petition" for market modification, and that "2013 was the first time in three years that Auglaize County had been assigned to the Lima DMA." *Ibid*. (PA-0835–PA-0836). The Commission

therefore had no reason to disagree with the Bureau's decision to give "little weight" to Block's economic expectations argument. *Ibid*. (PA-0836).

Block does not argue that "Auglaize County could never be reassigned by Nielsen to the Dayton DMA." Block Br. at 36. Instead, it contends that it had a legitimate expectation "that no other CBS affiliate broadcaster would be able to assert must carry rights *in the Lima DMA*." *Id*. at 36-37. But the Communications Act provides that must-carry rights attach to stations that are defined as local not only because they fall within the Nielsen DMA, but also that are defined as local because their market has been modified by the Commission to include the relevant community. Block's economic expectations cannot immunize it from the possibility that other stations may obtain must-carry rights by availing themselves of the statute's market-modification process.[9]

---

[9] Block also contends that instead of looking at "the past 46 years' worth of Nielsen DMA data," the Commission should have looked at the "previous twelve years," noting that the Auglaize County Communities had been assigned to the Lima DMA in eight of those years. Block Br. at 38. It was perfectly reasonable, however, for the Commission to have looked at the longer period to evaluate Block's economic expectations. In any event, even viewed through Block's narrow window, the Auglaize County Communities were assigned to the Dayton DMA fully one-third of the prior 12 years, and for the two years immediately preceding Cox's market-modification request.

## B. The Commission Did Not Misapply the In-State Service Factor.

Block next contends (Block Br. at 42) that the Commission erred in determining that modification of WHIO's market "would promote consumer's access to television broadcast station signals that originate in their State of residence." 47 U.S.C. §534(h)(1)(C)(ii)(III). Accordingly, Block maintains, the Commission should have given that factor "no weight" in its analysis. Block Br. at 42.

At the outset, Block's argument must be rejected because the Commission made clear that even if this factor were "disregard[ed]" altogether, it would have come out the same way. *Order on Review* at n.63 (PA-0836). As the Commission stated, "evaluation of the remaining factors supports the Bureau's decision to add [the] Auglaize County communities to WHIO's market." *Ibid*. In short, even if the Commission had given the in-state service factor no weight at all, as Block argues, the Commission would have granted Cox's market-modification request.

In any event, the Commission reasonably determined that the in-state service factor weighed in favor of modifying WHIO's market to include the Auglaize County Communities. As the Commission determined in its rulemaking implementing the amendment to Section 614, a petitioner seeking market modification will receive credit under this factor "simply by showing that the involved station is licensed to a community within the same state as the new

community." *In the Matter of Amendment to the Commission's Rules Concerning Market Modification*, 30 FCC Rcd 10406, 10420 ¶ 18 (2015) (*STELAR Report and Order*). The "factor may be found to weigh more heavily in favor of modification if the petitioner shows [that] the involved station provides programming specifically related to subscribers' state of residence, and may be given even more weight if such subscribers in the new community had little (or no) access to such in-state programming." *Ibid*. *See Order on Review* at ¶15 (PA-0834).

In this case, the Commission credited Cox with satisfying the in-state service factor because WHIO is licensed to Dayton, a city in the same state as the Auglaize County Communities, and found that the factor "weighs more heavily in favor of modification" because the station "provides programming specifically related to Ohio." *Ibid*. (PA-0834). But the Commission "decline[d] to give this factor additional positive weight" since there was "no evidence that Auglaize residents would 'have little (or no) access' to Ohio-focused programming absent service from WHIO." *Id.* at n. 47 (PA-0834).

Block contends that granting Cox's market-modification petition would not "promote" the access of consumers in the Auglaize County Communities to the signals of stations in Ohio because WHIO's signal already reaches the Auglaize County Communities, its programming was already on the cable systems in those

communities, and Block, which is itself an Ohio broadcaster, was already serving those communities. Block Br. at 42.

This argument is barred because Block never presented it to the Commission. Under 47 U.S.C. §405(a), the filing of a petition for reconsideration is "a condition precedent to judicial review" of an FCC order where the party seeking review "relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass." *See, e.g.*, *Cellnet Communications, Inc. v. FCC*, 149 F.3d 429, 442 (6th Cir. 1998). And although the in-state service factor was added to the Communications Act after Block had filed its application for review to the Commission, *see* Block Br. at 40, nothing prevented Block from seeking to supplement that briefing to address that factor, or to file a petition for reconsideration of the *Order on Review* once the Commission relied on it—as Section 405(a) requires.

In any event, the Commission has previously determined that the in-state service factor "appl[ies] to *any* situation that would increase access to in-state stations, regardless of whether there are other in-state stations present in the new community." *STELAR Report and Order*, 30 FCC Rcd at 10420 ¶18 (emphasis added). And there is nothing impermissible about concluding that, even when a station already covers and is carried in a particular community, modifying its

market to afford it must-carry rights in that community "promotes" the availability of that station's signals to the community's consumers.

### C. The Commission Properly Applied the Remaining Factors.

Block also takes issue with the Commission's evaluation of the historical carriage, local service, and viewing patterns factors. None of its criticisms have merit.

1. <u>Historical Carriage</u>. Block contends that the Commission's determination that the historical carriage factor weighed in favor of market modification was unsupported by substantial evidence because there was no evidence of how long WHIO was carried in "nine of the 23" Auglaize County Communities, and that the evidence showed that WHIO had been carried in three other communities for only "four years." Block Br. at 43-44. Block does not dispute, however, that WHIO was carried in all of the Auglaize County Communities at the time Cox filed its petition for market modification, and that in many of the communities WHIO had been carried for decades. *See Order on Review*, ¶10 (PA-0832). Moreover, although there may have been an absence of evidence "as to when service began" in nine of the communities, the record showed that "the entire County has been assigned to WHIO's Dayton DMA for the vast majority of the past half century"—*i.e.*, "38 out of the past 46 years." *Ibid*. (PA-0832). The record thus amply supported the Commission's determination that the Auglaize County Communities have been

associated with the Dayton market "for a considerable period of time." *Ibid.* (PA-0832).

2. <u>Local Service</u>. Block next contends that the Commission erred in its evaluation of "whether the television station provides coverage or other local service," 47 U.S.C. §534(h)(1)(C)(ii)(II), because it did not do so "on a community-by-community basis," Block Br. at 49.

Block misreads the Commission's rules. The Commission requires that "requested changes" to a station's market should be considered "on a community-by-community basis." *Bureau Order* at ¶4 (PA-0737) (citing *Must-Carry Order*, 8 FCC Rcd at 2977 n.139). But the Commission has traditionally refused "to restrict the types of *evidence* that parties can submit to demonstrate the propriety of changing a station's must-carry market." *Must-Carry Order*, 8 FCC Rcd at 2977 ¶47 (emphasis added). County-wide evidence may well provide support for a change in a station's market to include a particular community.

Here, the Commission reasonably took account of record evidence that showed that WHIO provided local service to each of the Auglaize County Communities. First, the Commission found (and Block does not dispute) that WHIO placed a Grade B signal over all of the Auglaize County Communities. *Order on Review* at ¶12 (PA-0832). Second, the Commission found that the record showed that "WHIO aired 65 news segments and 210 weather advisories that

directly affected Auglaize County" in a two-year period. *Id*. at ¶13 (PA-0833) (citing *Bureau Order* at ¶20 (PA-0743)).

Block complains that the record "contains no reference whatever to eleven out of the twenty-three communities." Block Br. 49. But nothing in the statute or the Commission's rules requires that there must be specific evidence of local programming directed to every affected community in a county in order to credit a petitioner under the local service factor, when there is specific evidence of such service to many of the communities, and evidence of signal coverage to all of them. The Commission's decision that the local service factor weighed in Cox's favor need only be supported by "substantial evidence." *See Cablevision*, 570 F.3d at 91. The evidence of signal coverage, combined with numerous examples of local programming directed to Auglaize County, amply satisfied that standard.

3. <u>Viewing Patterns</u>. Block likewise contends that the Commission erred in examining viewing patterns by looking at county-wide Nielsen ratings, "rather than considering ratings for each of the individual twenty-three Auglaize Communities." Block Br. at 50-51. Again, as we have explained, nothing in the statute or the Commission's rules imposes such an evidentiary requirement. And it was perfectly reasonable for the Commission to rely on ratings that showed that "WHIO was the highest-rated television station in Auglaize County" to support the

conclusion that "WHIO's programs are popular" in each of "the Auglaize County communities." *Order on Review* at ¶17 (PA-0835).

### D. Congress Did Not Mandate a Comparative Analysis in Section 614.

In addition to challenging the Commission's application of the specific factors delineated by Congress, Block also argues that "the Commission failed to follow Congress' explicit directive to 'afford particular attention to the value of localism,'" Br. at 31 (quoting 47 U.S.C. §534(h)(1)(C)(ii))—the overarching statutory objective. This argument has no merit.

For starters, Congress specifically delineated the five factors that the Commission addressed as ones the Commission should "tak[e] into account," 47 U.S.C. §534(h)(1)(C)(ii), in making the localism determination. As we have shown, the Commission engaged in precisely this exercise, and applied these factors appropriately.

Furthermore, Block's real argument seems to be that the Commission did not engage in a comparative analysis, determining whether WHIO or Block's stations did *more* to enhance localism. *See* Br. at 31. But the Commission has repeatedly rejected such an approach as unsupported by the statute. For example, in analyzing the fourth factor—other stations' programming—the Commission has clarified that "if a community's local needs are unserved by other stations, the absence will weigh in favor of adding the community to the petitioning station's

market," but if "other stations do serve the community's local needs, then this factor is to be given *neutral*"—not negative—"weight." *Order on Review* at ¶16 & nn.49-50 (emphasis added) (PA-0834) (citing *WTNH*, 22 FCC Rcd at 19768 ¶13). *See also* note 7, *supra*. Similarly, in implementing Congress's addition of the in-state service factor in STELAR, the Commission held that a station will get some boost under this factor *even if* a community otherwise receives in-state focused programming from another station. *See STELAR Report and Order*, 30 FCC Rcd at 10422 ¶ 20; pages 13-14, *supra*.

These authorities, read in light of the statute, preclude Block's attempt to bootstrap its own programming into evidence relevant to whether assigning the Auglaize County Communities to WHIO would advance localism.

## CONCLUSION

The Court should dismiss the petition for review for lack of jurisdiction because Block has not demonstrated Article III standing to challenge the agency's action. If the Court reaches the merits, however, the petition for review should be denied.

Respectfully submitted,

| | |
|---|---|
| MAKAN DELRAHIM<br>ASSISTANT ATTORNEY GENERAL | THOMAS M. JOHNSON, JR.<br>GENERAL COUNSEL |
| MICHAEL F. MURRAY<br>DEPUTY ASSISTANT ATTORNEY<br>   GENERAL | DAVID M. GOSSETT<br>DEPUTY GENERAL COUNSEL |
| | JACOB M. LEWIS<br>ASSOCIATE GENERAL COUNSEL |
| ROBERT B. NICHOLSON<br>PATRICK M. KUHLMANN<br>ATTORNEYS | |
| | /s/ Pamela L. Smith |
| UNITED STATES<br>   DEPARTMENT OF JUSTICE<br>WASHINGTON, D.C. 20530 | PAMELA L. SMITH<br>COUNSEL |
| | FEDERAL COMMUNICATIONS<br>   COMMISSION<br>WASHINGTON, D.C. 20554<br>(202) 418-1740 |
| April 22, 2019 | |

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    ☒    this document contains <u>7,204</u> words, *or*

    ☐    this document uses a monospaced typeface and contains _ lines of text.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    ☒    this document has been prepared in a proportionally spaced typeface using <u>Microsoft Word 2016</u> in <u>14-point Times New Roman</u>, *or*

    ☐    this document has been prepared in a monospaced spaced typeface using _____ with _____.

<u>*s/ Pamela L. Smith*</u>
Pamela L. Smith
Counsel
Federal Communications Commission
Washington, D.C. 20554
(202) 418-1740

## CERTIFICATE OF FILING AND SERVICE

I, Pamela L. Smith, hereby certify that on April 22, 2019, I filed the foregoing Brief for Respondents' with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the electronic CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

_s/ Pamela L. Smith_
Pamela L. Smith
Counsel

# STATUTORY ADDENDUM

Communications Act Provisions:
47 U.S.C. §405(a)
47 U.S.C. §534(a)
47 U.S.C. §534(h)(1)(A) & (C)

FCC Rules:
47 C.F.R. §76.55(e)
47 C.F.R. §76.59

## § 405. Petition for reconsideration; procedure; disposition; time of filing; additional evidence; time for disposition of petition for reconsideration of order concluding hearing or investigation; appeal of order

**(a)** After an order, decision, report, or action has been made or taken in any proceeding by the Commission, or by any designated authority within the Commission pursuant to a delegation under section 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely affected thereby, may petition for reconsideration only to the authority making or taking the order, decision, report, or action; and it shall be lawful for such authority, whether it be the Commission or other authority designated under section 155(c)(1) of this title, in its discretion, to grant such a reconsideration if sufficient reason therefor be made to appear. A petition for reconsideration must be filed within thirty days from the date upon which public notice is given of the order, decision, report, or action complained of. No such application shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement thereof, without the special order of the Commission. The filing of a petition for reconsideration shall not be a condition precedent to judicial review of any such order, decision, report, or action, except where the party seeking such review (1) was not a party to the proceedings resulting in such order, decision, report, or action, or (2) relies on questions of fact or law upon which the Commission, or designated authority within the Commission, has been afforded no opportunity to pass. The Commission, or designated authority within the Commission, shall enter an order, with a concise statement of the reasons therefor, denying a petition for reconsideration or granting such petition, in whole or in part, and ordering such further proceedings as may be appropriate: Provided, That in any case where such petition relates to an instrument of authorization granted without a hearing, the Commission, or designated authority within the Commission, shall take such action within ninety days of the filing of such petition. Reconsiderations shall be governed by such general rules as the Commission may establish, except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

## § 534. Carriage of local commercial television signals
### (a) Carriage obligations
Each cable operator shall carry, on the cable system of that operator, the signals of local commercial television stations and qualified low power stations as provided by this section. Carriage of additional broadcast television signals on such system shall be at the discretion of such operator, subject to section 325(b) of this title.

**§ 534. Carriage of local commercial television signals**
**(h) Definitions**
**(1) Local commercial television station**
**(A) In general**
For purposes of this section, the term "local commercial television station" means any full power television broadcast station, other than a qualified noncommercial educational television station within the meaning of section 535(l) (1) of this title, licensed and operating on a channel regularly assigned to its community by the Commission that, with respect to a particular cable system, is within the same television market as the cable system.

. . . .

**(C) Market determinations**
**(i)** For purposes of this section, a broadcasting station's market shall be determined by the Commission by regulation or order using, where available, commercial publications which delineate television markets based on viewing patterns, except that, following a written request, the Commission may, with respect to a particular television broadcast station, include additional communities within its television market or exclude communities from such station's television market to better effectuate the purposes of this section. In considering such requests, the Commission may determine that particular communities are part of more than one television market.
**(ii)** In considering requests filed pursuant to clause (i), the Commission shall afford particular attention to the value of localism by taking into account such factors as-
**(I)** whether the station, or other stations located in the same area, have been historically carried on the cable system or systems within such community or on the satellite carrier or carriers serving such community;
**(II)** whether the television station provides coverage or other local service to such community;
**(III)** whether modifying the market of the television station would promote consumers' access to television broadcast station signals that originate in their State of residence;
**(IV)** whether any other television station that is eligible to be carried by a cable system in such community in fulfillment of the requirements of this section provides news coverage of issues of concern to such community or provides carriage or coverage of sporting and other events of interest to the community; and
**(V)** evidence of viewing patterns in households that subscribe and do not subscribe to the services offered by multichannel video programming distributors within the areas served by such multichannel video programming distributors in such community.

# 47 C.F.R.

**§ 76.55 Definitions applicable to the must-carry rules.**

**(e) Television market.**

(1) Until January 1, 2000, a commercial broadcast television station's market, unless amended pursuant to § 76.59, shall be defined as its Area of Dominant Influence (ADI) as determined by Arbitron and published in the Arbitron 1991–1992 Television ADI Market Guide, as noted below, except that for areas outside the contiguous 48 states, the market of a station shall be defined using Nielsen's Designated Market Area (DMA), where applicable, as published in the Nielsen 1991–92 DMA Market and Demographic Rank Report, and that Puerto Rico, the U.S. Virgin Islands, and Guam will each be considered a single market.

(2) Effective January 1, 2000, a commercial broadcast television station's market, unless amended pursuant to § 76.59, shall be defined as its Designated Market Area (DMA) as determined by Nielsen Media Research and published in its Nielsen Station Index Directory and Nielsen Station Index US Television Household Estimates or any successor publications.

(i) For the 1999 election pursuant to § 76.64(f), which becomes effective on January 1, 2000, DMA assignments specified in the 1997–98 Nielsen Station Index Directory and September 1997 Nielsen Station Index US Television Household Estimates, available from Nielsen Media Research, 770 Broadway, New York, NY, shall be used.

(ii) The applicable DMA list for the 2002 election pursuant to § 76.64(f) will be the DMA assignments specified in the 2000–2001 list, and so forth for each triennial election pursuant to § 76.64(f).

(3) In addition, the county in which a station's community of license is located will be considered within its market.

(4) A cable system's television market(s) shall be the one or more ADI markets in which the communities it serves are located until January 1, 2000, and the one or more DMA markets in which the communities it serves are located thereafter.

(5) In the absence of any mandatory carriage complaint or market modification petition, cable operators in communities that shift from one market to another, due to the change in 1999–2000 from ADI to DMA, will be permitted to treat their systems as either in the new DMA market, or with respect to the specific stations carried prior to the market change from ADI to DMA, as in both the old ADI market and the new DMA market.

(6) If the change from the ADI market definition to the DMA market definition in 1999–2000 results in the filing of a mandatory carriage complaint, any affected party may respond to that complaint by filing a market modification request pursuant to § 76.59, and these two actions may be jointly decided by the Commission.

Note to paragraph (e): For the 1996 must-carry/retransmission consent election, the ADI assignments specified in the 1991–1992 Television ADI Market Guide, available from the Arbitron Ratings Co., 9705 Patuxent Woods Drive, Columbia, MD, will apply. For the 1999 election, which becomes effective on January 1, 2000, DMA assignments specified in the 1997–98 DMA Market and Demographic Rank Report, available from Nielsen Media Research, 299 Park Avenue, New York, NY, shall be used. The applicable DMA list for the 2002 election will be the 2000–2001 list, etc.

**§ 76.59 Modification of television markets.**

(a) The Commission, following a written request from a broadcast station, cable system, satellite carrier or county government (only with respect to satellite modifications), may deem that the television market, as defined either by § 76.55(e) or § 76.66(e), of a particular commercial television broadcast station should include additional communities within its television market or exclude communities from such station's television market. In this respect, communities may be considered part of more than one television market.

(b) Such requests for modification of a television market shall be submitted in accordance with § 76.7, petitions for special relief, and shall include the following evidence:

(1) A map or maps illustrating the relevant community locations and geographic features, station transmitter sites, cable system headend or satellite carrier local receive facility locations, terrain features that would affect station reception, mileage between the community and the television station transmitter site, transportation routes and any other evidence contributing to the scope of the market.

(2) Noise-limited service contour maps (for full-power digital stations) or protected contour maps (for Class A and low power television stations) delineating the station's technical service area and showing the location of the cable system headends or satellite carrier local receive facilities and communities in relation to the service areas.

Note to paragraph (b)(2): Service area maps using Longley–Rice (version 1.2.2) propagation curves may also be included to support a technical service exhibit.

(3) Available data on shopping and labor patterns in the local market.

(4) Television station programming information derived from station logs or the local edition of the television guide.

(5) Cable system or satellite carrier channel line-up cards or other exhibits establishing historic carriage, such as television guide listings.

(6) Published audience data for the relevant station showing its average all day audience (i.e., the reported audience averaged over Sunday–Saturday, 7 a.m.–1 a.m., or an equivalent time period) for both multichannel video programming distributor (MVPD) and non–MVPD households or other specific audience indicia, such as station advertising and sales data or viewer contribution records.

(7) If applicable, a statement that the station is licensed to a community within the same state as the relevant community.

(c) Petitions for Special Relief to modify television markets that do not include such evidence shall be dismissed without prejudice and may be refiled at a later date with the appropriate filing fee.

(d) A cable operator or satellite carrier shall not delete from carriage the signal of a commercial television station during the pendency of any proceeding pursuant to this section.

(e) A market determination under this section shall not create additional carriage obligations for a satellite carrier if it is not technically and economically feasible for such carrier to accomplish such carriage by means of its satellites in operation at the time of the determination.

(f) No modification of a commercial television broadcast station's local market pursuant to this section shall have any effect on the eligibility of households in the community affected by such modification to receive distant signals from a satellite carrier pursuant to 47 U.S.C. 339.